New Orleans & N. E. R. Co. *v.* Jackson.*

(Division B.   Nov. 2, 1925.)

[105 So. 770.   No. 25140.]

1. Trial. *Evidence to be taken most strongly in favor of one against whom directed verdict is requested.*

In determining propriety of directing verdict for plaintiff, the evidence is to be taken most strongly against plaintiff, and every material fact which the evidence tends to prove in favor of defendant, either directly or by reasonable inference, must be taken as established.

2. Commerce. *Within Safety Appliance Act carrier's switchman held injured on defective car "hauled or used on its line."*

Within federal Safety Appliance Act, section 2, as amended (U. S. Comp. St., section 8618), carrier's switchman was injured by defective handhold on car "hauled or used on its line," making it liable irrespective of negligence, the car when delivered to it, in

the course of interstate trip, for transportation to the end of the
trip being found to be in bad order and in need of repairs, and
the accident occurring while the car, after being placed in car-
rier's repair yards on the "shop lead" track, was being "spotted"
on a repair track; it being repaired without being unloaded, and
continued on its trip the day after its arrival at the station; the
stopping in the yards being simply a step in interstate com-
merce.

3. MASTER AND SERVANT. *Federal Safety Appliance Act not construcd
strictly.*

Federal Safety Appliance Act (U. S. Comp. St., section 8605 et seq.)
being a remedial statute for the benefit of railroad employees and
the traveling public, is to be construed, not strictly, but so as to
accomplish the purpose for which it is intended.

4. TRIAL. *Argument held appeal to passion and prejudice calculated
to influence amount of verdict.*

Argument of plaintiff's counsel, permitted by court, *held* to amount
to palpable appeal to jury's passions and prejudice, and calcu-
lated to influence them in fixing amount of verdict for injury,
especially as he was the district attorney.

5. APPEAL AND ERROR. *Counsel's argument, appeal to passion and
prejudice, held, in view of verdict, to require another trial on
question of damages.*

Argument of plaintiff's counsel, amounting to appeal to jury's pas-
sions and prejudice, and calculated to influence amount of ver-
dict, requires another trial on question of damages; verdict,
though not so large as alone to evince passion and prejudice,
being large for the injury.

*Headnotes 1. Trial, 38 Cyc., p. 1586; Directing verdict for plain-
tiff, 26 R. C. L. 1073; 2. Commerce, 12 C. J., Section 42; Haul, 29 C. J.,
p. 215 (Anno.); Federal Safety Appliance Act, 5 R. C. L. 717; 3.
Master and Servant, 39 C. J., Section 503; 4. Trial, 38 Cyc., p. 1498;
5. Appeal and Error, 4 C. J., Section 2939. Appeal to prejudice in
argument of counsel, 2 R. C. L., p. 426; 1 R. C. L. Supp., p. 531.

APPEAL from circuit court, of Lauderdale county.

HON. C. C. MILLER, Judge.

Action by Grant Jackson against the New Orleans &
Northeastern Railroad Company. Judgment for plain-
tiff, and defendant appeals. Reversed and remanded for
new trial on question of damages.

*Bozeman and Cameron,* for appellant.

*The court erred in instructing the jury that the plaintiff was injured as a result of the violation of the Safety Appliance Act of the Federal Government, and in directing the jury to award the plaintiff damages.* The testimony wholly fails to show that when the plaintiff was injured, the car in question was either being "hauled" or "used," "on its line" by the defendant.

The prohibition of the Safety Appliance Act is that: "It shall be unlawful for any carrier subject to the provisions of this Act to haul, or permit to be hauled, or used on its line, any car subject to the provisions of this Act, not equipped, etc." Hence a carrier may have in its possession and in its repair yard a car not equipped as required by the Safety Appliance Act, without violating the Act.

Our point is that the car here in question was not being hauled or used *on the line* of the defendant at the time of plaintiff's injury. The movement was a merely incidental switching movement from one repair track to another, having exclusive relation to the work of repair; and was not, as we submit, the hauling or use of the car on the line of defendant, in violation of the Safety Appliance Act.

We have been unable to find any case holding that an incidental movement of a bad order car in a repair yard, for the purpose of "spotting," or spacing, in order that repairs might be more conveniently made, even the movement from one repair track to another, was a violation of the Safety Appliance Act.

The courts have held in some cases that a switching movement of a defectively equipped car might be a violation of the Safety Appliance Act, but in all such cases the switching movement was either a movement for a considerable distance; usually, if not always, involving the use of the main line of the railroad, or in connection with the handling of cars which were being moved in

commerce, and not for the purpose of repair. A typical and frequently cited case of this kind is *Southern Ry. Co.* v. *Snyder,* 205 Fed. 868; 124 C. C. A. 60.

Under the Safety Appliance Act it was the affirmative duty of the Alabama Great Southern Railroad, the carrier in possession of this car, when its defective appliances were discovered, to have the same repaired before hauling the car further, and before delivery to its connecting carrier, and the connecting carrier (the defendant in this case), and a perfect right to decline to receive the car for further carriage until it had first been repaired, and made to comply with the Safety Appliance Act. *B. & O. S. W. R. Co.* v. *United States,* 242 Fed. 420; 155 C. C. A. 196; *United States* v. *L. & J. Bridge Company,* 1 Fed. (2nd) 646 (C. C. A.). See also *B. & O. R. Co.* v. *Hooven,* 297 Fed. 919 (C. C. A.); *McCalmont* v. *Penn. R. Co.,* 283 Fed. 736 (C. C. A.); *L. & J. Bridge Co.* v. *United States,* 249 U. S. 534; *U. S.* v. *Northern Pacific R. Co.,* 293 Fed. 657 (C. C. A.).

The Act certainly does not prohibit a carrier from having in its possession or on its repair track a car not equipped, etc., as required by the Act, even though it be then an instrument of interstate commerce and under load. Indeed, it has long been held that the Act applies to cars, whether interstate or intra-state, "hauled" or "used" upon an *interstate highway*. *T. & P. R. Co.* v. *Rigsby,* 241 U. S. 33; 60 L. Ed. 874.

All of the cases which have held the Safety Appliance Act to apply to switching movements resulting in personal injury, which have come to our attention, may be readily distinguished from the case at bar, and we do not think that any one of them would be authority for holding that the Act should be applied in the case at bar, but, on the contrary, we submit that they all show that in the case at bar certain essential elements necessary to bring it within the Act are wholly lacking. For instance, see the *Rigsby case,* 241 U. S. 33, 60 L. Ed. 874; *Southern R.* v. *U. S.,* 222 U. S. 20, 56 L. Ed. 72; *Great N.*

*R. Co.* v. *Otos,* 239 U. S. 349, 60 L. Ed. 322; *Delk* v. *St. Louis & S. F. R. Co.,* 220 U. S. 580, 55 L. Ed. 590.

The distinction between the Delk case and the case at bar is plain. After diligent search we have found no case that goes so far as to hold such an incidental movement of a car, all within the repair yards, to be a "hauling" or "use" of a car, within the terms of the Safety Appliance Act.

Is it a violation of the Safety Appliance Act to move a bad order car at all in the repair yards? As an extreme case, suppose a bad order car was standing on a repair track to be repaired. In order to get at the defective appliance it becomes necessary, or desirable, to move the car a distance of five or ten feet. An engine is attached and pulls the car this distance of five or ten feet—all on the same repair track. Can it be said that the railroad company "hauled or used this car on its line" in violation of the Safety Appliance Act?

Of course, a car may be "hauled" (using the word in its literal signification) on the repair track five feet or five miles; but was such an incidental movement of five or ten feet on a repair track, for convenience in repairing a car, contemplated by the Safety Appliance Act?

We earnestly submit, therefore, that in instructing the jury that this case was controlled by the Safety Appliance Act, and in giving the jury a peremptory instruction to assess damages in favor of the plaintiff, the court below committed a reversible error.

II. *Verdict excessive, and based on passion and prejudice of the jury.* The amount of the verdict is grossly excessive, and is not warranted by the testimony, but is the result of erroneous instructions as to the measure of the damages, and on the passions and prejudice of the jury, engendered by the improper argument of counsel, to which exception was duly taken.

Plaintiff's counsel (the district attorney) stated and argued to the jury that the law which the defendant vio-

lated (meaning the Safety Appliance Act) was the same as the law against murder and against rape, and that in fact the injury of the plaintiff was nothing but murder; and in arguing to the jury that they should give the plaintiff a good verdict, because lawsuits are expensive, and because the defendant railroad company made the plaintiff sue, and that Congress did not pass this law to help the plaintiff, but passed it because so many mothers' sons were being slaughtered by the railroad companies—more than were killed in the war—and they had to put a stop to it.

There was no evidence to support these statements of counsel. There was no intimation even in the testimony, or in the course of the trial, that the plaintiff was ever willing to accept of the defendant reasonable compensation for his injury; or that the defendant had refused to make a reasonable settlement with the plaintiff, or that the defendant railroad company "made the plaintiff sue." These remarks of counsel were highly improper and prejudicial to the defendant, and placed the defendant in an attitude before the jury of having maliciously murdered the plaintiff, and of then having forced him to sue for compensation.

If a negro switchman is entitled to ten thousand dollars as actual compensation for a broken leg, how much would the defendant have to pay for his death?

The instructions should certainly have been so given as to advise the jury that they could not, in estimating the damages to be awarded the plaintiff, allow him his full wages for the period beginning at the date of his injury and extending up to his trial, his "loss of time," some eighteen months, and at the same time award him damages for any loss of earning capacity, which necessarily began at the date of his accident and continued to the end of his expectancy. This is double damages, certainly for the eighteen months loss of time period.

In support of this proposition we cite the following cases, warranting reversal for excessive verdicts rendered under such conditions: *Perkins* v. *Guy,* 155 Miss. 153 (182-3); *Newman Lbr. Co.* v. *Norris,* 130 Miss. 751; *Watts* v. *Espey,* 101 So. 106; *Brotherhood of Painters* v. *Trimm,* 207 Ala. 587; *Metropolitan Ins. Co.* v. *Carter,* 102 So. 130.

*M. V. B. Miller* and *Reily & Parker,* for appellee.

I. *The court rightfully decided that the Federal Safety Acts applied.* It has been the uniform custom of the Federal courts to construe the Federal Safety Appliance Act broadly so as to accomplish the purpose intended. *Johnson* v. *Southern Pac. Co.,* 49 L. Ed. 369; *United States* v. *Chicago, M. & St. P. Ry. Co.,* 149 Fed. 486; *Gray* v. *Louisville & N. R. Co.,* 197 Fed. 876; 2 Roberts Federal Liabilities of Carriers, 1266.

Quite a number of decisions of the Federal courts are cited by Roberts under this section, showing that the Federal courts have uniformly given this statute a broad interpretation, so as to accomplish its purpose, and have not permitted the contentions of the railroads to fritter away the statute that is "so highly meritorious, so generous in its purpose, so in harmony with the best sentiment of a humane people, and a progressive government, that it appeals strongly to the courts for its prompt and vigorous enforcement." *U. S.* v. *Southern R. R. Co.,* 135 Fed. 129.

The car causing appellee's injury was received by the New Orleans & Northeastern Railroad Company, appellant, when it had not been properly equipped as provided by the Safety Appliance Act, and the defect in the handhold did not become defective and insecure while such car was being used by the New Orleans & Northeastern Railroad Company. This conclusion is inescapable, because within eight hours after the car came into Meridian on the A. G. S. freight train, the handhold pulled out. The board

to which it was attached was rotten; and in addition to that one end of it was screwed on contrary to the provisions made by the Safety Appliance Act. See *B. & O. S. W. R. R. Co.* v. *U. S.*, 242 Fed. 422, cited by counsel, to the effect that: *"A defective car cannot be hauled for repairs, without liability for the statutory penalty, except by the carrier upon whose line it became defective while being used."*

In *U. S.* v. *Northern Pacific Ry. Co.*, 293 Fed. 657, cited by counsel, the court said: *"Under the law the defendant in error was forbidden to haul this car over its lines any distance, for any purpose, because the defect arose on the lines of another carrier  . . ."* This same doctrine was clearly recognized in *United States* v. *Louisville & J. Bridge & R. Co.*, 1st Fed. (2nd) 646.

Under the above four authorities cited in appellant's brief, it is clear that the New Orleans & Northeastern Railroad Company did not even come within the clause permitting the hauling of the defective car in question to mill track No. 1 for the purpose of having this car repaired. Under these authorities, cited by counsel, they were liable if they moved this car any distance for any purpose; and certainly they would be liable to appellee because he is one of the class of employees that the statute is designed to protect.

On page 1277 of Roberts on Federal Liabilities of Carriers, we have the following: "The Safety Appliance Act applies to locomotives, cars and similar vehicles whenever and wherever they are located on the rails of an interstate highway. If the railroad is engaged in interstate commerce and that use is not restricted to the main line, but is extended to side tracks, spurs and other like connections, then all cars on such tracks are within the purview of the Safety Appliance Act, even though used at the time solely in intrastate commerce." See also *United States* v. *Chesapeake & O. Ry. Co.*, 213 Fed. 752.

Some of the cases recognize the fact that the greatest dangers to employees of railroads are not on the main

line, but the dangers of the switching movements in the yards. Any practical and informed man knows that this is true. See the Gray case, reported in 197 Fed. at p. 874.

The trial court, in the Rigsby case, as in the case at bar, gave a peremptory instruction in favor of Rigsby. The circuit court of appeals upheld the decision of the trial court. Judge PARDEE, however dissented, *holding in the dissenting opinion every contention as contended for by counsel in the case at bar.*

The facts in the Rigsby case are not as strong as the facts in the case at bar, for in the Rigsby case it was contended that the car in question was empty and had been so for a month, and was not in use, and was not engaged in interstate commerce. Counsel in the case at bar admits that this car was employed in interstate commerce at the time of appellee's injuries.

Under the authority of the Delk case, the Otos case, and the Rigsby case, the contentions of counsel are no longer open questions, but are definitely, and well-settled by the decisions of the United States supreme court, which are binding on this court, involving all constructions of the Employer's Liability Act, and the Safety Appliance Act; therefore, we shall not discuss this question further.

II. *Was the verdict excessive?* It was shown without dispute that the whole handhold and ladder on top of the car pulled out and threw appellee some fourteen or sixteen feet to the ground, and across some timbers, about six by eight; the fall almost paralyzing appellee, because of the intense pain, and breaking his leg, and injuring his side and back; that plaintiff's left side was hurt; that the bone in his left hip was broken some four or five inches below the joint; that he was found lying on the ground, groaning, by the foreman of his crew; that after lying there on the ground some forty minutes appellee was finally taken to Dr. Turner's hospital, where X-rays were made of his injuries, and he was treated by Drs. Turner and Gully, remaining in the hospital some twenty-five days.

Appellee's left leg was some one and a half to two inches shorter than his right leg, after his injury, and the bone in his left leg was not only broken, but it was split between the break and the hip joint in such a way as to cause an injury to the largest nerve in the body which was in that region, and there was a permanent tenderness that would always cause pain. This condition was observable from an external examination. Dr. Robinson and Dr. Clark testified that this was a permanent condition, and that it was necessary for plaintiff to wear on the short leg a shoe with a high heel.

In discussing the question of whether the damages were excessive, appellant contends "that the closing argument of appellee's counsel was highly improper and prejudicial, and contributed to the excessive verdict." The argument of counsel for appellee was not improper and intemperate.

Counsel for appellant in his argument to the jury injected the race question into the case, by telling the jury that the negro race was a servant race, and that the race problem would best be solved by keeping them as a servant race, and any time that the negro race got so much money that they would not work, that they would become a very great menace to the white race.

All of the argument complained of in this case was in response to a statement made by counsel for appellant in presenting their side of the case. Instead of counsel for appellant complaining about the argument, the appellee is the one that really has a just ground for complaint. Having been trial lawyers, members of this court can appreciate the probable effect of this line of argument on a jury when time and again the appellee was referred to as a negro, and three thousand dollars being the greatest verdict for an injury of this kind; and that a large verdict would be a menace to the white race, and that the first thing negroes do when they get money is to buy an automobile and drive up and down the highways in a dangerous manner. An argument such as was made by appellant's counsel has repeatedly been held reversible error

by the court. Argument by one counsel in answer to argument of adverse counsel is never grounds for reversal. *Maine* v. *Rittenmeyer,* 151 N. W. 499; *Bean* v. *Kindseder,* 139 Pac. 1024; *Fadden* v. *McKinney,* 89 Atl. 351; *Cranford* v. *O'Shea,* 134 Pac. 486; *Collum* v. *Strange,* 85 S. E. 344; *City of Americus* v. *Gammage,* 84 S. E. 144; *Smith* v. *Boswell,* 124 S. W. 264.

Counsel for appellant asked the question if it cost them ten thousand dollars to break this nigger's leg, what would it have cost them if they had killed him? This negro would have earned ten thousand dollars in less than five years. This negro had an earning capacity of one hundred and seventy-five dollars a month before his injury because of his ability to switch box cars. He spent eleven years in continuous service of this railroad company prior to his injury. Even if he recovered, and his pain and suffering ceases, which inference is not warranted by the evidence, what can he earn as a laborer? Not more than fifty or sixty dollars a month at the outside. Thus, as long as he lives he will not only pay for this injury in pain and suffering, but it will cost him one hundred and twenty-five dollars a month, or over fifteen hundred dollars per year, in addition thereto.

I called the court's attention heretofore to the fact that up until the time of the trial appellee had already lost something over three thousand one hundred dollars in wages alone. Courts have permitted verdicts to stand for five thousand dollars for suffering alone, where the pain was no greater than the record shows this appellee to have suffered. Under the peculiar facts of this case, this verdict is a moderate one.

The question is not whether the verdict is excessive, but whether "so flagrantly improper as to *evince passion, prejudice, or corruption in the jury.*" *N. O.* v. *Jackson & Great Northern Railroad Company,* 36 Miss. 660; *Hurst* v. *Railroad Company,* a Missouri case, 219 S. W. 566, 10 A. L. R. 174; *Dole* v. *New Orleans Light & Railway Company,* 46 So. 929; *Rogers* v. *Lumber Company,* 129

La. 900; 39 L. R. A. (N. S.) 202, 57 So. 166; *Hulse* v. *St. Joseph Railroad,* 214 S. W. 156; the Grant case, 86 Miss. 565; *Y. & M. V. R. R.* v. *Cobb,* 94 Miss. 561.

Next to losing his life, appellee was caused to suffer the most serious injury that could befall him—that of being physically incapacitated for following his profession, thus taking away from him most of his potential earning capacity; and causing him to suffer the most intense pain.

This case should be affirmed without a *remittitur.*

Argued orally by *A. S. Bozeman,* for appellant, and *Martin Miller* and *Marion W. Reily,* for appellee.

Anderson, J., delivered the opinion of the court.

This action was brought by appellee, Grant Jackson, in the circuit court of Lauderdale county against appellant, New Orleans & Northeastern Railroad Company, for damages for personal injuries sustained by him through the alleged negligence of appellant while employed by appellant as a switchman in its yards at Meridian. Appellee was awarded judgment for ten thousand dollars, from which judgment appellant prosecutes this appeal. The trial court directed a verdict for appellee on the question of liability, and submitted alone to the jury the question of damages.

The appellant contends that the court erred in peremptorily instructing the jury to return a verdict in favor of appellee on the question of liability. In determining the propriety of such an instruction the evidence must be taken most strongly against appellee. Every material fact which the evidence proves, or tends to prove, in favor of appellant, either directly or by reasonable inference, must be taken as established. So, viewing the evidence, the following case was made:

Appellee's declaration alleged, and the evidence showed, that, when appellee's injury took place, appellant was engaged in interstate commerce, and appellee was em-

ployed·in like commerce. Appellee, a negro switchman in appellant's yards, was engaged with his crew in pushing a cut of eighteen bad order cars onto a repair track at appellant's shops, and in spacing, or spotting, the cars on this track for the convenience of car repairers. The appellee climbed up on top of the cut of cars in order to pass signals, and in climbing down from one of the bad order cars in the cut he pulled off a handhold which was on top of the car, and fell to the ground, breaking his leg, and receiving other injuries.

The trial court instructed the jury that appellant was liable for the injury on the theory that the federal Safety Appliance Act (U. S. Comp. St., section 8605 et seq.) applied. Appellee seeks to justify the instruction alone because that act applies; and, furthermore, it is clear from the record in the case that the instruction can be justified alone on that ground. The applicable provision of the act is in this language:

"Sec. 2. That on and after July first, nineteen hundred eleven, it shall be unlawful for any common carrier subject to the provisions of this act to haul, or permit to be hauled or used on its line any car subject to the provisions of this act not equipped with appliances provided for in this act, to-wit: . . . Secure handholds or grab irons on their roofs at the tops of such ladders." Section 2, 27 Stat. 531; chapter 196, U. S. Comp. St. section 8606, as amended by Act of April 14, 1910, 36 Stat. 298, c. 160, U. S. Comp. Stat., section 8618.

Appellee's contention was that the evidence showed appellant was guilty of a violation of the Safety Appliance Act, and therefore liable for appellee's injury without regard to any question of negligence or assumption of risk. The evidence did establish without conflict that a defective handhold on the car caused appellee's injury. The trial court adopted appellee's view, and therefore directed a verdict in his favor. If appellee's contention be correct, the court committed no error in so doing.

Appellant's contention was that the movement of the defective car at the time and place of the injury did not bring the case within the terms of the Safety Appliance Act, but that the case was governed by the federal Employers' Liability Act (U. S. Comp. St., sections 8657-8665), and therefore negligence on the part of appellant causing the injury had to be affirmatively shown by evidence; that the question of negligence was one for the jury. Appellant's position is that at the time and place of the injury the defective car causing appellee's injury was not being "hauled" or "used" "on its line," and hence the Safety Appliance Act did not govern.

The bad order car causing the injury was a W. & T. car, No. 327, loaded with lumber, moving from Oneta, Tenn., on the Cincinnati, New Orleans & Texas Pacific Railroad and its connecting lines to Meridian; thence over appellant's line of railroad to New Orleans, La. The car arrived at Meridian in an extra freight train over the Alabama Great Southern Railroad on April 13, 1923, at 4:45 p. m. On arrival at Meridian it was found to be in bad order and in need of repairs. It was repaired in the repair yards of appellant at Meridian on April 14, 1923. It was while the car was being spotted on a repair track for the convenience of the car repairers that plaintiff was injured. After the car was repaired, it was carried to New Orleans by appellant, leaving Meridian at 11:15 on the 14th of April, 1923. The car was not unloaded; it came into Meridian and into appellant's repair yards loaded with lumber, and, after being repaired, was carried by appellant to New Orleans, without the load having been disturbed.

The Alabama Great Southern Railroad Company and appellant maintained joint yards at Meridian; the switching in these yards being done by a joint crew of the two companies. Near these switching yards, but wholly separated from them, appellant, in connection with its railroad shops at Meridian, maintained repair tracks and yards which were devoted exclusively to the repairing of

bad order cars. After this bad order car had been inspected and tagged as such, it was taken out of the Alabama Great Southern train of which it was a part, and placed in appellant's repair yards on a track known as the "shop lead," together with seventeen other bad order cars, and was standing on this track when appellee and his crew came on duty at midnight on April 13, 1923. There were some eight or more repair tracks running off from this shop lead, and standing upon some of these repair tracks were bad order cars which had been repaired during the preceding day, and were ready to be used or forwarded. Among the duties appellee and his crew performed as employees of appellant was that of shoving bad order cars standing on the shop lead onto one of the repair tracks, and to separate, or space, or spot each of the cars so that the car repairers could pass around them and conveniently make repairs. It was during such a movement that appellee was injured. After the cars were repaired, it was the duty of appellee and his crew to pull them out of the repair tracks over the shop lead and distribute them as directed by the switching list.

The supreme court held in *T. & P. Railway Co.* v. *Rigsby,* 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874, that a switchman in the employ of an interstate railway company who was injured through a defect in the handhold or grabiron forming one of the rungs of a ladder on a box car which he was descending, after having set a brake operated from the roof of such car, was within the protection of the Safety Appliance Act, although the employee, when injured, was engaged in taking the defective car to the shops for repairs. In that case the bad order car had been standing on a spur track perhaps a month awaiting repairs. The car was being switched to the shops for repairs. It was during that movement that the injury complained of occurred. Among other things, the court said:

"The defendant in error, Rigsby, while in the employ of plaintiff in error as a switchman in its yard at Marshall, Tex., was engaged, with others of the yard crew, in taking some 'bad order' cars to the shops there to be repaired. The switch engine and crew went upon a spur track, hauled out three cars, and switched them upon the main line, intending to go back upon the spur track for others, to be taken with the three to the shops, which were on the opposite side of the main line from the spur track. Rigsby, in the course of his duties, rode upon the top of one of the cars (a box car) in order to set the brakes and stop them and hold them upon the main line. He did this, and while descending from the car to return to the spur track, he fell, owing to a defect in one of the handholds or grabirons that formed the rungs of the ladder, and sustained personal injuries. This car had been out of service and waiting on the spur track for some days, perhaps a month. . . . It was admitted that the main line of defendant's railroad was in daily use for the passage of freight and passenger trains in interstate commerce. . . .

"It is argued that the statute does not apply except where the car is in use in transportation at the time of the injury to the employee, and that since it does not appear that the car in question was in bad order because of any negligence on the part of the railway company, and it was being taken to the shop for repairs at the time of the accident, there is no liability for injuries to an employee who had notice of its bad condition, and was engaged in the very duty of taking it to the shop. This is sufficiently answered by our recent decision in *Great Northern R. Co.* v. *Otos,* 239 U. S. 349, 351, 36 S. Ct. 124, ante [60 L. Ed.] 322, 323, where it was pointed out that although section 4 of the Act of 1910 [U. S. Comp. St. section 8621] relieves the carrier from the statutory penalties while a car is being hauled to the nearest available point for repairs, it expressly provides that it shall not be construed to relieve a car-

rier from liability in a remedial action for the death or injury of an employee caused by or in connection with the movement of a car with defective equipment.
. . .

"The doing of plaintiff's work, and his security while doing it, cannot be said to have been wholly unrelated to the safety of the main track as a highway of interstate commerce; for a failure to set the brakes so as temporarily to hold the 'bad order' cars in place on that track would have been obviously dangerous to through traffic; while an injury to the brakeman had a tendency to cause delay in clearing the main line for such traffic. Perhaps upon the mere ground of the relation of his work to the immediate safety of the main track plaintiff's right of action might be sustained.

"But we are unwilling to place the decision upon so narrow a ground, because we are convinced that there is no constitutional obstacle in the way of giving to the act in its remedial aspect as broad an application as was accorded to its penal provisions in *Southern R. Co. v. United States, supra* [222 U. S. 20, 32 S. Ct. 2, 56 L. Ed. 72]."

It will be observed that in that case, in order to get the bad order car which caused the injury from the switch track, where it had been awaiting repairs for some time, to the repair yards, it had to pass over the main line of defendant's railroad, and, while the car was on the main line, the injury complained of occurred.

It is true the court said that, while so situated, a failure to set the brakes so as to hold temporarily the bad order car in place on the track would have endangered through traffic; and, furthermore, that an injury to the brakeman would have had a tendency to delay the clearing of the main line for through traffic; and that perhaps upon the mere ground of the relation of the plaintiff's work to the immediate safety of such traffic on the main track his action might be sustained. But the court went further and distinctly held that it was unwilling

to place its decision upon so narrow a ground, because there was no constitutional obstacle in the way of giving to the Safety Appliance Act in its remedial aspect as broad an application as was accorded its penal provisions, and that the Safety Appliance Act applied, and the railroad company was liable to the switchman for his injury.

Appellant argues that there are material differences between the facts in that case and those in the present case; that in that case the bad order car causing the injury, although being moved from a side track, where it had been for perhaps a month awaiting repairs, to the repair yards, was at the time of the injury on the main line, which was a step in its movement; while in the present case the movement of the bad order car causing the injury was alone from the shop lead track, which was an instrumentality of the repair yards, to one of appellant's repair tracks. Although that difference in the facts of the two cases exists, we think, considering the reasoning of the supreme court, that the plaintiff in that case would have been permitted to recover, even though the injury had occurred on one of defendant's tracks leading into the repair yards and not on its main line.

In *Great Northern Railroad Co.* v. *Otos,* 239 U. S. 349, 36 S. Ct. 124, 60 L. Ed. 322, the facts were substantially as follows: The plaintiff was a switch foreman engaged in breaking up a train that had come into the state of Minnesota from the West. At the moment when he was injured he had three cars attached to a switch engine; the rear one consigned to Duluth, and to be switched to another track; the next consigned to Minneapolis; both loaded. The automatic coupler on the Minneapolis car was out of order, and needed repairing, and had been marked for repairs, and was to be switched to the repair track before going farther. In the switching operation, the plaintiff being unable to uncouple the Duluth car from the side without going between the cars, because the

pin lifter was missing, did so while the cars were moving, and was injured.  The court said, among other things:

"The defendant argues that the car had been withdrawn from interstate commerce, and that therefore the act of March 2, 1893, chapter 196, section 2, 27 Stat. 531, Comp. St. 1913, section 8606, does not apply; that if it does apply, the defendant was required by that act and the supplementary act of April 14, 1910, chapter 160, 36 Stat. 298, Comp. Stat. 1913, section 8617 [8618]; to remove the .car for repairs, and that its effort to comply with the statutes could not constitute a tort; and that the plaintiff was a person intrusted by it with the details of the removal, and could not make it responsible for the mode in which its duty was carried out; that he might have detached the car while it was at rest.  But we are of opinion that the argument cannot prevail.  The car was loaded and in fact was carried to Minneapolis the next day.  It had not been withdrawn from interstate commerce, but merely subjected to a delay in carrying it to its destination.  At the moment of the accident it was accessory to switching the Duluth car.  It does not seem to us to need extended argument to show that the car still was subject to the act of Congress.  *Delk* v. *St. Louis & S. F. R. Co.*, 220 U. S. 580, 31 S. Ct. 617, 55 L. Ed. 590."

It will be noted that the court said that the car had been loaded to be carried to Minneapolis; in fact, was carried there the next day; that it had not been withdrawn from interstate commerce, but merely subjected to a delay in carrying it to its destination.

In *Delk* v. *St. Louis & S. F. R. R. Co.*, 220 U. S. 580, 31 S. Ct. 617, 55 L. Ed. 590, the court held that a freight car loaded with interstate freight, and placed on a side track in the railway yards at its destination to await repairs to the automatic coupler, was being used in moving interstate commerce within the meaning of the Safety Appliance Act when a coupling with another car was attempted by the carrier's order during switching operations.

Since the decision of the Rigsby, Otos, and Delk cases by the supreme court of the United States, we think but little aid can be obtained in considering the decisions of the lower federal courts and state courts of last resort construing the Safety Appliance Act, in view of the fact that the decisions of the supreme court on this subject are controlling on all courts, state and federal. Although neither of those decisions of the Supreme Court of the United States is directly in point with the case here on its facts, nevertheless we are of opinion that this case comes within the terms of the act which is not to be strictly construed, but, being a remedial statute for the benefit of railroad employees and the traveling public, is to be construed so as to accomplish the purpose for which it is intended.

It is true that, while the car on which appellee was injured was not, at the particular time of the injury, actually moving in commerce, nevertheless the stopping of it under the circumstances in appellant's repair yards at Meridian, in our opinion, was simply a step in interstate commerce. The car came into Meridian loaded. When its bad order was discovered it was switched into appellant's repair yards, with the same load, where it was repaired, without being unloaded, and went out in a few hours on its journey to its destination. It cannot be said with reason that the car had ceased to be a commercial car. The evidence fairly shows that appellant had received the car, not primarily for repairs, but for transportation; that the necessary repairs were made that the car might be carried by appellant to its destination. The repair of the car was mere incident. The dominating thing was the carrying of the car by appellant over its line of road to New Orleans. We think not only the language of the Safety Appliance Act applies to the facts of this case, but they come within the reason and purpose of the act. It follows from these views that the trial court did not err in directing a verdict for appellee on the question of liability.

Appellant assigns as error intemperate argument made to the jury by one of appellee's attorneys, who was the district attorney of the district in which this case was tried. Appellant urges that this argument was of such a character as was calculated to bring about the verdict that was rendered; that it was prejudicial and harmful to the rights of appellant. The argument in question was the closing argument in the case. The attorney making the argument made the following statements to the jury [to which appellant objected, which objection was overruled by the court and the action of the court excepted to by appellant. [That the law violated by appellant which caused appellee's injury "was the same as the law against murder and against rape, in fact, this is nothing but murder;" that Congress did not pass the Safety Appliance Act "to help this poor devil (referring to appellee); they passed it because so many mothers' sons were being slaughtered by the railroad companies—more than were killed in the war—and they had to put a stop to it;" that he wanted the jury to give appellee "a good verdict because lawsuits are expensive, and they (meaning appellant) made him sue, and you ought to give him a good verdict because they made him file this suit." (There is no evidence in the record to sustain this statement of fact.) Referring to the fact that appellant's attorney continued to object to this character of argument, appellee's attorney said further:

"You have all plowed a little old mule in the sun all morning and got his back sore and then thrown the saddle on him to ride to the ball game. You've seen the saddle pinch him and seen the little old mule twist and wiggle because it pinched. He (meaning appellant's attorney) keeps on excepting to my argument because it pinches."

Appellee's attorney stated to the jury further that appellant "took two X-ray pictures of plaintiff's leg; one at the time of the first injury and one at the time of the second injury (injury from falling after original injury). Where are those pictures? They didn't bring them up

and show them to the jury." (The record shows no evidence that X-ray pictures were taken.) Appellant's objection to this latter statement was sustained, and the court instructed the jury to disregard it.

We cannot say, judging alone from the size of the verdict in this case, that it is so large as to evince passion or prejudice on the part of the jury, but it is large in our opinion for the injury done. And this argument by appellee's attorney which was permitted and thereby approved by the court probably had great influence with the jury in fixing the amount of their verdict. It was certainly calculated to have that effect. The statements of fact and argument of appellee's attorney amounted to a palpable appeal to the passions and prejudices of the jury. And there went with it the fact that the attorney making the argument held the high office of district attorney. The jury had a right to look upon him especially as the representative of the law-abiding, law-enforcing citizens of that community. The appellee's attorney went too far; he said too much. It was calculated to dethrone the reason and equilibrium of the jury. We think this error in the trial court was so grave that there ought to be another trial of this cause on the question of damages.

If there was any error in the instructions to the jury on the question of damages, we think it was harmless. Possibly under the instructions given appellee the elements of damages were made to overlap each other, but it is hardly probable that the jury so understood the instructions. Perhaps on another trial appellee's instructions on damages should be revised with a view of avoiding that criticism.

Reversed and remanded for a new trial on the question of damages alone.

*Reversed and remanded.*