## YAZOO & M. V. R. CO. *v.* DECKER.*

(Division A.   March 26, 1928.)

[116 So. 287.   No. 26769.]

622

*Corpus Juris-Cyc. References: Appeal and Error, 4CJ, p. 918, n. 42; Constitutional Law, 12CJ, p. 1233, n. 86; Death, 17CJ, p. 1326, n. 3; Master and Servant, 39CJ, p. 1139, n. 80; Witnesses, 40Cyc, p. 2352, n. 95; p. 2381, n. 27; p. 2388, n. 83; p. 2687, n. 93; p. 2744, n. 57; As to duty and liability under Federal and State railway safety appliance acts, see annotation in 20 L. R. A. (N. S.) 473; 41 L. R. A. (N. S.) 49; 18 R. C. L. 614; 3 R. C. L. Supp. 831; 4 R. C. L. Supp. 1199; 6 R. C. L. Supp. 1080.

*Hirsh, Dent & Landau, Chas. N. Burch, H. D. Minor* and *Clinton H. McKay,* for appellant.

624

*A. A. Chaney, Vollor & Kelly* and *E. O. Sykes,* for appellee.

Argued orally by *R. L. Dent* and *Chas. N. Burch,* for appellant, and *R. M. Kelly* and *E. O. Sykes,* for appellee.

Cook, J.  This suit was instituted in the circuit court of Warren county, by Mrs. Willie May Decker, administratrix of the estate of R. P. Decker, deceased, to recover damages for the death of the said R. P. Decker, who was found in a dying condition on a hillside, near his home, in the city of Vicksburg, at about eight-thirty P. M., on March 27, 1926.

The declaration alleged, in substance, that on and prior to March 27, 1926, the said R. P. Decker was employed by the defendant as a flagman on one of its freight trains running from Vicksburg, in the state of Mississippi, to points in the state of Louisiana; that as such flagman it frequently became and was his duty to ride on top of box cars of the defendant in going about the work which he was employed to do; that the box cars were equipped with grabirons or handholds on the side of and near the ends of each car, said grabirons or handholds being safety appliances for the use and benefit of the employees of the defendant company; that it was the duty of the defendant to keep and maintain said grabirons or handholds in safe condition so that its employees would not be subjected to unnecessary danger while in the performance of their work; that on the morning of March 27, 1926, the said R. P. Decker left Vicksburg, Miss., as a flagman on one of defendant's freight trains destined for points south of Vicksburg and points in the state of Louisiana; that about one o'clock in the afternoon the train arrived at Harriston, or a point near said station; that while the train was at that station, in pursuing his duties, Decker undertook to climb down from

the top of a box car in said train, and in doing so caught hold of one of the grabirons or handholds on the side or near the end of said car that on account of the weak, insecure, loose, and defective condition of this grabiron or handhold, it came loose from its fastenings, thereby causing the said Decker to fall to the ground and suffer serious injuries, both external and internal; and that, as a result of the injuries so suffered by reason of the breaking or coming loose of said grabiron or handhold, he died in about seven or eight hours after receiving such injuries. It was further alleged that at the time of his death Decker was earning a salary of two hundred ten dollars per month, and that he left surviving him his widow and three small children; and the suit was brought in the name of his widow, as administratrix, to recover damages in the sum of fifty thousand dollars, for the benefit of his estate and his widow and children.

To the declaration the defendant filed a plea of the general issue, accompanied by a notice thereunder setting up that it would offer evidence to prove that the decedent was found dead in a back yard or alley near his home, in the city of Vicksburg, about eight forty-five P. M., on March 27, 1926, with a bottle of whisky on his person and the smell of whiskey on his breath; that he had vomited profusely, and there was froth and other substance running from his nose and mouth; that he had not been in active service of the defendant since about two twenty P. M. of that day, several hours prior to the time his body was found in the back yard of his home; and that after the body of decedent was found a jury of inquest was impaneled and made a full investigation of decedent's death and returned a verdict that he had died from an unknown cause.

This cause was submitted to the jury, under instructions from the court, and there was a verdict and judgment in favor of the plaintiff for thirty thousand dollars, and from this judgment the defendant prosecuted this appeal.

Throughout the record the facts are sharply controverted. Shannon Rollins, a witness for plaintiff, testified that he was well acquainted with Decker, and that on a certain day in the latter part of March, 1926, when a freight train on which Decker was working stopped north of the depot at Harriston he was in a field about fifty or sixty yards away from the train; that he saw Decker start to climb down off the top of a box car in said train, when one end of the grabiron or handhold on the side of and near the top of the box car broke loose from the car and precipitated Decker to the ground about eight or nine feet below; that Decker lay on the ground for several minutes, when the conductor of the train came to him and helped him to get up and assisted him in walking towards the depot; and that on the following day it was reported that Decker was dead.

There was testimony to the effect that Decker left his train at McNair, the first station south of Harriston, and boarded a passenger train to return to Vicksburg, and that he reached Vicksburg about five thirty o'clock in the afternoon; that he walked to his home and when he reached his home he was complaining of intense suffering in his back and side and had a bruise on his head; that he ate his supper and left his home about seven fifteen o'clock ostensibly to go to a nearby grocery store to see about a bill of groceries that had not been delivered to his home; that while he ate his supper he continued to complain of great pain and suffering in his back and side; that about forty-five minutes later he was discovered in an alleyway between his home and the grocery store in a dying condition. When he was discovered in this alley an alarm was given and a number of people, including a policeman and a doctor, quickly gathered at the scene. Evidences on the ground showed that the deceased struggled a good deal before dying and that he suffered from intense nausea. He lived only a few moments after the arrival of the doctor who was

summoned to attend him, and the policeman who was present testified that he took from the person of the deceased a half pint flask which was entirely full of some white liquid; that he handed this bottle to Dr. Podesta, who had been summoned to attend the suffering man; and that Dr. Podesta poured out the contents of this bottle.

About two months after his death a *post mortem* examination of the body of the deceased was made, at which there were present and participating Drs. Lippincott, Johnson, Haralson, and Myers. Drs. Haralson and Myers testified at great length as to their observations at and conclusions drawn from this *post mortem* examination. Dr. Haralson testified that in his opinion the deceased had three bodily injuries, either one of which would have caused his death, these being injuries to the heart, brain, and stomach. Among many others, Dr. Myers was asked the following question:

"Assuming Dr. Myers that some six or eight hours before his death he fell eight or ten feet from the top of a box car, taken in connection with the finding of the autopsy and based on your experience for thirty years as a physician, what will you state to the jury was the cause of Mr. Decker's death?"

To this question he replied:

"I think this man died as a result of an injury as applied to his abdomen which caused an injury to the mesentery vessels and an injury to his stomach and possibly an injury to his heart, and he must have fallen also on the head, there was a bruise there, otherwise it would not have been there."

For the defendant, Conductor Allen, who was in charge of the train from which Decker is alleged to have fallen, testified that he did not see Decker while his train was at Harriston, and, if he fell from a box car at that point, he (Allen) knew nothing about it; that, when he went into the caboose after they left Harriston, Decker

was lying on the bed, but got up; that they sat in the caboose until they got to McNair, the first station below Harriston; that Decker got off the caboose at McNair, closed the switch, and again caught the caboose as it pulled in on the side track; that at this time Decker's locomotion and movements were natural, and there were no visible scars on his face, or other parts of his body; that while the train was at McNair he and Decker got off the caboose and walked down the train to Pennsylvania car No. 440400, where they found two handholds loose at one end, these two handholds being about six or seven feet from the ground; that after his car was inspected Decker walked back to the passenger station, a distance of about forty car lengths; that Decker did not then appear to be injured; and that he did not see him again that day.

Conductor Allen further testified that the handholds on the side of the car were originally fastened with bolts placed through the side of the car, from the inside, and fastened with nuts screwed on and bradded on the ends of the bolts on the outside of the car; that the two bolts that were missing from the ends of the loose handholds were found lying on the floor on the inside of the car; that the ends of these bolts appeared to have been freshly chiseled off so that the nuts could be removed; that the nuts were not found and he did not know when or where they were taken off.

On cross-examination this witness was interrogated in regard to an affidavit signed by him that was a part of a proof of death which was furnished the Continental Casualty Company, and in which the witness' answers to questions propounded to him in reference to the deceased's injury and death and the circumstances of his injury were at variance with and contradictory of his testimony given on the witness stand. He admitted that he signed this affidavit, but said that the statements made by him in this affidavit were based upon information, and

were not made of his own knowledge. This affidavit was offered and admitted as an exhibit to the testimony of the witness.

On cross-examination a proper predicate was laid for the contradiction of this witness in reference to certain statements made to three different parties to the effect that Decker fell off a box car on account of one of the grabirons pulling loose; that he went to where Decker had fallen and assisted him in getting up and getting to the caboose; and that he appeared to suffer greatly from the fall. The witness denied making these statements, and in rebuttal the three parties referred to in laying the predicate were introduced as witnesses, and they each testified that the statement was made to them on the occasion named.

The appellant offered the testimony of one of its special agents, who saw Decker as he was returning to Vicksburg, the ticket agent at Harriston, the conductor on the passenger train on which Decker rode back to Vicksburg, and the division superintendent of appellant company, each of whom testified that he saw Decker on this occasion and did not observe anything in his appearance to indicate that he was injured. Two other witnesses were offered who testified that they saw Decker after he reached Vicksburg and saw nothing in his appearance to indicate that he was suffering from any injury.

On the night that Decker died his body was removed to an undertaking establishment and there his body was examined by the undertaker and two physicians, each of whom testified that there were no marks or bruises on any part of the body, and no evidences of injury or traumatism. Dr. Lippincott, the pathologist who conducted the *post mortem* examination of the body, testified that he found no evidence of any injuries to the body, either external or internal. Dr. Johnson, who was present when the *post mortem* examination was made, testified that there were no evidences of injuries to the man, either ex-

ternal or internal, and that, in his opinion, he died from embolus, from an embolus taking off from a diseased valve and then carried to the brain. Drs. Martin and Knox heard all the evidence in the case, and testified that, in their opinion, based on the evidence in the record, Decker did not die from any kind of injury.

Dr. Podesta, a physician of the city of Vicksburg, was called to attend Decker when he was found lying on the ground near his home. The doctor arrived at the scene and began his examination of the man, but he died two or three minutes thereafter. This doctor was offered as a witness, by whom it was proposed to prove that, while he was making his examination of the patient, he saw a half pint bottle full of whisky taken from the patient, and that he (the doctor) poured out the contents of this bottle; that from the amount of whisky he smelled there—from his vomit—he was of the opinion that the deceased had been drinking or was drunk; that alcohol or whisky may cause acute dilation of the heart; and that in his opinion the deceased died from acute dilation of the heart. This testimony was objected to on the ground that it was privileged, and this objection to the testimony of this doctor was sustained.

The appellant first assigns as error the action of the court below in refusing to grant the peremptory instruction requested by it, and in refusing to set aside the verdict as opposed to the great weight of the convincing evidence.

The Federal Safety Appliance Act (U. S. Comp. St., section 8605 *et seq.* [45 U. S. C. A., section 1 *et seq.*]) imposes upon interstate carriers the absolute and unqualified duty, irrespective of any question of negligence, to maintain in proper condition the safety appliances required thereby to be installed on cars used in interstate commerce, and this act has been so construed in numerous decisions of this court, among them being *A. & V. Railroad Co.* v. *Dennis,* 128 Miss. 298, 91 So. 4; *Y. & M.*

*V. Railroad Co.* v. *Cockerham,* 134 Miss. 887, 99 So. 14; and *N. O. & N. E. Railroad Co.* v. *Jackson,* 140 Miss. 375, 105 So. 770. The United States supreme court has so construed this act in numerous decisions. In the case of *D'elk* v. *St. Louis & San Francisco Railroad Co.,* 220 U. S. 580, 31 S. Ct. 617, 55 L. Ed. 590, this rule is stated in headnote No. 2, in the following language:

"An absolute duty to provide every car used in moving interstate traffic with automatic couplers, and to maintain them in proper condition at all times and under all circumstances, is imposed upon interstate carriers by the Safety Appliance Act of March 2, 1893, which was not discharged by properly equipping the car with automatic couplers, and using due diligence to keep them in good working order."

In the case of *Great Northern Railway Co.* v. *Otos,* 239 U. S. 349, 36 S. Ct. 124, 60 L. Ed. 322, it was held that:

"Whether or not the absolute liability imposed upon the carrier, under the Safety Appliance Act of March 2, 1893. (27 Stat. at L. 531, chapter 196, Comp. Stat. 1913, section 8606 [45 U. S. C. A. section 2]), extends to the moving of a car defectively equipped to a place where it may be repaired, the supplementary act of April 14, 1910 (36 Stat. at L. 298, chapter 160, Comp. Stat. 1913, section 8617 [45 U. S. C. A., section 16]), unmistakably imports that the liability exists."

In the case of *Texas & Pacific Railway Co.* v. *Rigsby,* 241 U. S. 33, 36 S. Ct. 482, 60 L. Ed. 874, it was held that:

"Interstate railway companies are charged with an absolute and unqualified duty, irrespective of any question of negligence, to maintain in proper condition the safety appliances which, under the acts of March 2, 1893 (27 Stat. at L. 531, chapter 196, Comp. Stat. 1913, section 8605 [45 U. S. C. A., section 2]), March 2, 1903 (32 Stat. at L. 943, chapter 976, Comp. Stat. 1913, section 8613 [45 U. S. C. A., section 8]), and April 14, 1910 (36 Stat. at L. 298, chapter 160, Comp. Stat. 1913, section 8617 [45

U. S. C. A., section 16]), must be installed on railway cars used on a highway of interstate commerce.''

In the case of *Chicago, B. & Q. Railway Co.* v. *U. S.*, 220 U. S. 559, 31 S. Ct. 612, 55 L. Ed. 582, it was held that a carrier using, in moving interstate traffic, cars whose condition does not satisfy the requirements of the Safety Appliance Acts, cannot escape the penalty therein prescribed by showing that it exercised reasonable care in equipping its cars with the required safety appliances, and used due diligence to keep them in repair by the usual inspection; but the statutes impose an absolute duty upon the carrier which is not discharged by the exercise of reasonable care or diligence, and many other cases to the same effect might be cited.

That a handhold on the side of one of the cars in the train on which the decedent was employed was loose shortly after the time at which he is alleged to have fallen from a car is not controverted. The witness Rollins testified positively that he saw Decker attempting to climb down off the top of a car, and saw the handholds thereon come loose from their fastenings, thereby precipitating Decker to the ground, and that Decker remained prostrate on the ground until the conductor of the train reached him and assisted him in getting up off the ground and in walking away from the place where he fell. While this witness was unable to definitely fix the day of the month on which this occurred, he testified that he heard a report of Decker's death on the next day after he saw him fall from the car, and we are of the opinion that the testimony of this witness, in connection with the circumstances in evidence, and the testimony of Drs. Myers and Haralson that in their opinion the death of the deceased was the result of an injury suffered shortly before he died, required the submission of the cause to the jury, and that the court below committed no error in refusing to grant the peremptory instruction requested by the defendant, or in refusing to

set aside the verdict on the ground that it was opposed to the great weight of convincing evidence.

The second assignment of error is based upon the admission in evidence of the affidavit of Conductor Allen, which had been filed with an insurance company, while the third assignment is based upon the admission, in rebuttal, of the testimony of Ross, Flowers, and Abbott, the three witnesses who testified to statements made by Conductor Allen which were at variance with and contradictory of the testimony of this witness, and we will dispose of these two assignments together.

The conductor was offered as a witness by the appellant and he testified at length as to the conditions at the station at Harriston on the occasion when Decker was alleged to have fallen, and, among other things, he testified positively that he did not see Decker on the ground at Harriston, and did not render him any assistance, and did not hear of the claim that he had fallen and was injured until after his train left Harriston. The affidavit and the testimony of the witnesses who were offered in rebuttal tended to contradict this testimony of the conductor in these, as well as other material respects, and, while this contradictory testimony was not admissible as tending to establish the truth of the subject-matter thereof, it was admissible for the purpose of impeaching the credibility of the witness Allen.

The appellant next contends that the court erred in excluding the testimony of Dr. Podesta to the effect that whisky was contained in the bottle taken from the body of the deceased, and that, in his opinion, the deceased died from acute dilation of the heart; the contention of the appellant in this regard being that the Mississippi privileged communication statute has no application to a case under the Federal Employers' Liability Act (45 U. S. C. A., sections 51-59; U. S. Comp. St., sections 8657-8665) where the effect of enforcing such statute would be to prevent the defendant from introducing proof on

the main point in issue, and that the construction and application given the statute in the court below renders the same unconstitutional, in violation of the Fourteenth Amendment of the Federal Constitution.

The privileged communication statute (section 3695, Code 1906 [section 7455, Hemingway's 1927 Code]), provides that all communications made to a physician or surgeon by a patient under his charge, or by one seeking professional advice, shall be privileged, and such physician or surgeon shall not be required to disclose the same in any legal proceeding, except at the instance of the patient, and in the case of *Y. & M. V. Railroad* v. *Messina,* 109 Miss. 143, 67 So. 963, it was held that by this statute it was the purpose of the legislature to close the lips of the physician concerning any and everything he knows about the patient by oral communication or from a physical examination of his patient. It is argued, however, that this statute, as applied in the case at bar, had the effect of being more than a rule of evidence, and was a rule of substantive law, and that it denied the appellant a substantial right, in that it prevented it from introducing proof on the main point in issue.

In the case of *N. O. & N. E. Railroad Co.* v. *Jackson,* 145 Miss. 702, 110 So. 586, it was held that the privileged communications statute applied in actions under the Federal Employers' Liability Act, but it is contended that the Jackson case is not controlling here for the reason that in that case only the *quantum* of damages was involved, while here the proffered testimony bears upon the main question of liability. We do not think the *Jackson case, supra,* can be distinguished on that ground and, as we view it, the reasoning of that case applies with equal force in the case at bar. In the *Jackson case, supra,* in discussing the effect of this statute, the court said that:

"The privileged communications statute does not affect the substantive rights and obligations of the parties. It is a statute affecting alone the competency of certain

witnesses. Under the common law, a wife was not a competent witness against her husband either in a criminal or civil cause; that is true now under the common law in this state. A case under the Federal Employers' Liability Act can well be imagined where the wife of the injured employee would be the only material witness for the railroad company. In such a case, would the refusal of the court to permit the wife to testify over the objection of the plaintiff be a denial of a substantive right to the railroad? We think not. The supreme court of the United States has not gone that far. We see no difference in principle in the case imagined and the present case.''

The next assignment presents the contention that the instructions of the court as to the duty of the company in maintaining safe handholds are in direct conflict, and therefore present reversible error.

Instruction No. 1 for the plaintiff reads as follows:

''The court instructs the jury, for the plaintiff, that the law imposes upon the defendant the positive duty to keep and maintain the handhold or grabiron in question in safe condition, and that care and due diligence, on the part of the defendant company, is no defense whatsoever; that if you believe from a preponderance of evidence that the handhold or grabiron broke or came loose from its fastenings, and that Mr. Decker was caused to fall and suffer injuries by reason thereof, then you will return a verdict for the plaintiff, if you believe, from the evidence, the injuries so suffered caused his death or contributed to his death.''

Instruction No. 2 for the defendant reads as follows:

''The court instructs the jury for the defendant that if they believe from the evidence that the grabirons were removed by a trespasser or other party over whom the defendant had no control, and that the defendant did not know and could not have known by the exercise of a reasonable degree of diligence that said grabirons were

loose at the time decedent is alleged to have fallen therefrom, then and in that event they will find for the defendant.''

The conflict in these instructions of which the appellant complains was caused by the fact that the appellant's instruction No. 2 is erroneous. The plaintiff's instruction No. 1 correctly states the law in line with the absolute and unqualified duty imposed by the Safety Appliance Act as construed in the several authorities hereinbefore referred to and quoted, while the instruction upon this point granted to the appellant was more favorable to it than it was entitled to, and therefore it cannot complain. While the appellant would not be liable for an injury to Decker caused by the loosening of a handhold if Decker himself had intentionally caused it to be loosened, or had been in any way instrumental in causing it to be loosened, but we do not think there is any evidence in this record that would warrant a finding by the jury that Decker was in any way instrumental in causing the handhold to be loosened. If the handhold was loosened by the act of a trespasser, or a party over whom the appellant had no control, other than the injured employee himself, the exercise of a reasonable degree of diligence to ascertain and remedy the defective condition would not, as stated in its instruction No. 2, relieve appellant of liability for an injury to such employee from the use of the handhold in its defective condition.

We do not think any of the other assignments of error which involve the question of liability are of sufficient importance or merit to call for a discussion, and upon the question of liability we think the judgment of the court below must be affirmed.

The appellant assigns as error two instructions granted to the appellee which bear upon the measure of damages recoverable; these instructions being numbered 4 and 5, and reading as follows:

Instruction No. 4. "The court instructs the jury that it was no part of the duty of the deceased, R. P. Decker, to keep in repair the handhold or grabiron in question; that he had a right, under the law, to use it and to assume that it was in safe condition; that, if it broke or came loose and caused his death or contributed to the cause of his death, your verdict must be for the plaintiff; and that, if your verdict is for the plaintiff, you will award such sum as you may believe, from all of the evidence in the case, will reasonably compensate his wife and children for the loss they sustained."

Instruction No. 5. "The court instructs the jury that, if your verdict is for the plaintiff, in fixing the amount of damages you will take into consideration the age of the deceased, his life expectancy, his earning capacity, the amount contributed by him to the support of his family, his probable future earning, and loss of services to his wife and children, and award such sum as you, as responsible men, believe, from the evidence, will reasonably compensate them from their loss, not to exceed the amount sued for."

We think these instructions are erroneous. No damages were sought in the declaration or in the instructions for the conscious pain and suffering, if any, endured by the deceased from the time it is claimed the fatal injury was sustained until his death, and the damages recoverable should have been limited to the financial loss sustained by the surviving relatives for whose benefit the action was brought. By instruction No. 4, the jury was told that:

"If your verdict is for the plaintiff, you will award such sum as you may believe, from all the evidence in the case, will reasonably compensate his wife and children for the loss they sustained."

The loss sustained by a wife and children by reason of the death of the husband and father covers a very wide field, and frequently could not be compensated by any

amount of money. . The jury may have construed this instruction as authorizing them to return such a verdict as would reasonably compensate the wife and children for the loss of society, protection, counsel, and consortium of the husband and father. The same vice is inherent in instruction No. 5, and, in addition, this instruction told the jury that they might compensate the wife and children for the "loss of services" to them. What kind of services? The services, other than pecuniary benefits bestowed, which a husband and father may render to the wife and children, are many and varied.

In the case of *Hines* v. *Green,* 125 Miss. 476, 87 So. 649, this court said:

"Under the Federal Employers' Liability Act the plaintiff would be limited to the monetary value, or the present value of the amount of money, they would have received for support, gifts, etc., had the deceased lived, and would not be entitled to recover for such parts of the value of the expectancy as the deceased himself would have earned, but would not have turned over to the family, and they would not be entitled to damages for loss of society, counsel, or consortium."

In the case of *Norfolk & Western Ry. Co.* v. *Holbrook,* 235 U. S. 625, 35 S. Ct. 143, 59 L. Ed. 392, the court said:

"Under the Employers' Liability Act, where death is instantaneous, the beneficiaries can recover their pecuniary loss and nothing more; but the relationship between them and the deceased is a proper circumstance for consideration in computing the same. The elements which make up the total damage resulting to a minor child from a parent's death may be materially different from those demanding examination where the beneficiary is a spouse or collateral dependent relative; but in every instance the award must be based upon money values, the amount of which can be ascertained only upon a view of the peculiar facts presented."

In *Chesapeake & Ohio Railway Co.* v. *Kelly,* 241 U. S. 485, 36 S. Ct. 630, 60 L. Ed. 1117, the court announced the rule in the following language:

"The damages should be equivalent to compensation for the deprivation of the reasonable expectation of pecuniary benefits that would have resulted from the continued life of the deceased."

In the case of *Gulf, Colorado & Santa Fe Railway Co.* v. *McGinnis,* 228 U. S. 173, 33 S. Ct. 426, 57 L. Ed. 785, the court, in construing the act, in part, said:

"In a series of cases lately decided by this court, the act in this aspect has been construed as intended only to compensate the surviving relatives of such a deceased employee for the actual pecuniary loss resulting to the particular person or persons for whose benefit an action is given. The recovery must therefore be limited to compensating those relatives for whose benefit the administrator sues as are shown to have sustained some pecuniary loss. *Michigan C. R. Co.* v. *Vreeland,* 227 U. S. 59, *ante,* 417, 33 S. Ct. 192 [57 L. Ed. 417, Ann. Cas. 1914C, 176]; *American R. Co.* v. *Didricksen,* 227 U. S. 145, *ante,* 456, 33 S. Ct. 224 [57 L. Ed. 456]. In the last-cited case, speaking of the Employers' Liability Act, we said (page 149):

" 'The cause of action which was created in behalf of the injured employee did not survive his death, nor pass to his representatives. But the act, in case of the death of such an employee from his injury, creates a new and distinct right of action for the benefit of the dependent relatives named in the statute. The damages recoverable are limited to such loss as results to them because they have been deprived of a reasonable expectation of pecuniary benefits by the wrongful death of the injured employee. The damage is limited strictly to the financial loss thus sustained.' "

The judgment of the court below will therefore be affirmed as to liability, but for the errors indicated in the

instructions on the measure of damages recoverable, the judgment will be reversed in so far as it awards damages, and the cause will be remanded for trial on the question of damages only.

*Affirmed in part, and reversed in part.*